UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

ASHLEY N. WAKEFIELD                                                                PLAINTIFF

       VS.                              Civil No. 2:14-cv-02119-MEF

CAROLYN W. COLVIN,                                                                 DEFENDANT
Commissioner of Social Security Administration

## MEMORANDUM OPINION

Plaintiff, Ashley N. Wakefield, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act (hereinafter "the Act"). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

### I.    Procedural Background:

Plaintiff filed her application for SSI on July 26, 2012, alleging an onset date of January 8, 1993 due to bipolar, schizophrenia, suicidal, self-harm, anxiety, and social disorder. (T. 191) Plaintiff's applications were denied initially and on reconsideration. (T. 86-89, 96-98) Plaintiff then requested an administration hearing, which was held in front of Administrative Law Judge ("ALJ"), Hon. Clifford Shilling, on August 14, 2013. Plaintiff was present and represented by counsel.

At the time of the hearing, Plaintiff was 20 years old and had the equivalent of a high school education. (T. 191) She did not have any past relevant work experience.

On January 10, 2014, the ALJ found Plaintiff's borderline personality disorder, depression, post-traumatic stress disorder, polysubstance abuse in remission, and obesity severe. (T. 14) Considering the Plaintiff's age, education, work experience, and the residual functional capacity ("RFC") based upon all of her impairments, the ALJ concluded Plaintiff was not disabled since the filing of her application on July 26, 2012. (T. 21) The ALJ determined Plaintiff had the RFC to perform a full range of work at all exertional levels, but with the following non-exertional limitations: Plaintiff could perform work in which interpersonal contact was incidental to the work performed and the complexity of the tasks was learned and performed by rote, with few variables and little judgment, and where the supervision required was simple, direct, and concrete. (T. 17)

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on March 28, 2014. (T. 1-4) Plaintiff then filed this action on May 22, 2014. (Doc. 1) This case is before the undersigned pursuant to consent of the parties. (Doc. 7) Both parties have filed briefs, and the case is ready for decision. (Doc. 10 and 11)

## II.     Applicable Law:

This court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). The Court must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In

other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the Court must affirm the ALJ's decision. *Id.*

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §1382c(a)(3)(D). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. *See* 20 C.F.R. §416.920(a)(4). Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §416.920(a)(4)(v).

### III. Discussion:

The Court must determine whether substantial evidence, taking the record as a whole, supports the Commissioner's decision that Plaintiff had not been disabled since the date of her application, July 26, 2012. Plaintiff raises four issues on appeal, which can be summarized as: (A) the ALJ failed to fully and fairly develop the record; (B) the ALJ erred in his step three determination; (C) the ALJ erred in evaluating Plaintiff's subjective complaints of pain and in his application of *Polaski*; and, (D) the ALJ erred in his RFC determination. (Doc. 10, pp. 11-20)

### RFC determination:

Plaintiff asserts the ALJ erred in his RFC determination. (Doc. 10, pp. 17-20) The Court agrees.

RFC is the most a person can do despite that person's limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009); *see also Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (ALJ is responsible for determining RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own description of his limitations). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) Therefore, a claimant's RFC assessment "must be based on medical evidence that addresses the claimant's ability to function in the workplace." "An administrative law judge may not draw upon his own inferences from

medical reports." *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). Instead, the ALJ should seek opinions from a claimant's treating physicians or from consultative examiners regarding the claimant's mental and physical RFC. *Id.*; *Strongson v. Barnhart,* 361 F. 3d 1066, 1070 (8th Cir. 2004.)

The medical evidence is as follows.

On June 20, 2008 Plaintiff sought treatment from Dr. Stephanie Frisbie for abdominal issues. The notes indicated Plaintiff had a lot of behavioral issues. She received treatment from Vista Health and saw a psychiatrist, but stopped because she was drugged out and could not manage. Plaintiff gained weight on Lexapro and Seroquel. Plaintiff was diagnosed with bipolar, but stated she just had anger issues. She had been in and out of the court system and her parents just divorced. (T. 406) A psychiatric review showed Plaintiff was nervous, anxious, depressed, and had trouble falling asleep. (T. 406) Plaintiff was prescribed Abilify and Miralax. (T. 407)

Prior to being admitted to Pinnacle Point on September 3, 2008, Plaintiff had been in a juvenile detention facility since August 31, 2008 for stealing her mother's car. (T. 371) Plaintiff was 15 years of age and referred to Pinnacle Pointe because of self-harming behaviors. (T. 368) Plaintiff had previous inpatient treatments at Vista Health in 2005 and 2007. Plaintiff reported she made suicidal statements and made lacerations on her forearms and wrists. Plaintiff had been increasingly agitated, labile, and impulsive. Plaintiff had low energy, poor concentration, and feelings of hopelessness and helplessness. (T. 368) She could not see any positive qualities about herself and felt worthless. (T. 368) Plaintiff was casually dressed and fairly well-groomed. While her eye contact was poor throughout the interview, she was cooperative. She demonstrated some degree of psychomotor slowing. Her speech rate and tone were normal. Her mood was dysphoric

and anxious, while her affect was constricted. There was no evidence of acute psychosis. Plaintiff was alert and oriented to person, place, time, and situation. (T. 369) Plaintiff's intellectual functioning range was average. Her judgment was poor and her insight was limited. (T. 369)

Plaintiff was admitted to the Youth Acute Treatment Center and placed on suicide and elopement precautions. During her stay, Plaintiff attended individual, group, and family therapies. Initially Plaintiff's affect was flat, and she was quiet and guarded. She was withdrawn and socially isolative. (T. 369) As treatment continued, Plaintiff increased her level of participation and was able to identify and address her issues prior to discharge. (T. 369) Plaintiff was referred to Lord's Ranch for residential treatment and discharged on September 10, 2008 with the following medications: Lexapro, Vistaril, diphenhydramine, Risperdal, and Synthroid. (T. 369) Plaintiff was diagnosed with major depression, recurrent, severe, and disruptive behavior disorder, not otherwise specified. Upon admission her Global Assessment of Functioning ("GAF") score was 15 and upon discharge she had a GAF of 35. Her highest GAF score was 45. (T. 370)

Plaintiff was admitted to Trinity Behavioral Health Care on September 10, 2008 due to adjustment disorder with depressed mood. (T. 418) Plaintiff was admitted due to severe emotional and behavioral disturbances. Plaintiff verbalized suicidal thoughts and her mood was severely depressed. (T. 419)

On September 17, 2008, treatment records from the Lord's Ranch indicated Plaintiff was diagnosed by Dr. Mark Brown with adjustment disorder D/O with depressed mood and conduct D/O adolescent onset type. (T. 439) Plaintiff had very unstable emotions. Her adoptive parents finalized their divorce and her biological mother tried to convince Plaintiff her adoptive parents took her away from her. Prior to admission, Plaintiff caused a wreck after slapping her adoptive mother in the face. Plaintiff was paranoid that someone was watching her. She was physically

aggressive towards people and threatened to beat them up. She exhibited homicidal ideations, threatened to kill a teacher, and cut her dad's throat. She engaged in self-injurious behavior cutting her arms on numerous occasions and injuring her hands when she punched the walls. (T. 439) Plaintiff stated she wanted to kill herself, she wished she was dead, and she did not want to be there. When she became nervous or anxious, Plaintiff would pick nail polish off her nails or isolate herself. (T. 439) Plaintiff would also binge eat and then throw up. (T. 444) Plaintiff was prescribed Lexapro for depression, Risperdal for mood stabilization, anger, and aggressive behavior, and Vistaril for anxiety. (T. 458) Plaintiff was diagnosed with adjustment disorder with depressed mood, conduct disorder adolescent onset, and assessed a GAF score of 38. (T. 463)

Treatment notes from June 9, 2009 indicated Plaintiff broke the rules and became verbally aggressive, her behavior appeared to be triggered by parental conflict. Plaintiff was described as loud, obnoxious, and she demanded attention. Plaintiff was very rude and disrespectful of the staff; she was defiant toward the teachers and a bully toward her peers. (T. 425)

During the course of her treatment the notes indicated Plaintiff made significant improvements with her mood. She did not verbalize suicidal thoughts, minimized self-harming behaviors, was no longer withdrawn, and she engaged in various activities. (T. 419) Plaintiff took the following medications while at the facility: Synthroid, Lexapro, Wellbutrin, Trazadone, and Melatonin. (T. 423) Treatment notes indicated Plaintiff's issues with depression, suicidal ideation, and aggression towards self and others had been resolved. (T. 418) Plaintiff was discharged on June 25, 2009, with the notes indicating she had attained an acceptable benefit. (T. 418)

On August 4, 2009 Plaintiff sought treatment from Advanced Nurse Practitioner Marie Pham-Russell for possible sexually transmitted diseases. At the time of the appointment, Plaintiff was under house arrest for breaking into cars. (T. 400)

On August 13, 2009 Plaintiff sought treatment from Dr. Frisbie for multiple issues. Plaintiff was in outpatient drug rehabilitation. She had slipped out of the house a lot and stolen her mother's care twice. She had taken PCP, marijuana, cocaine, Xanax, Adderall, and amphetamines. She had a lockbox on her ankle and was taking Doxycycline for chlamydia. (T. 397) Plaintiff was restless, anxious, and depressed. (T. 398) Dr. Frisbie assessed Plaintiff with abdominal pain, hypothyroidism, and major depressive disorder, unspecified, and she prescribed Nexium and increased her dosage of Lexapro. (T. 398)

Plaintiff sought treatment from Dr. Frisbie again on November 11, 2009 due to abdomen pains, dizziness, headaches, a sore throat, and nausea. (T. 394) Plaintiff reported she had not cut herself in a long time; however, she was going away to another treatment facility. (T. 394) At the time of the appointment Plaintiff was taking Nexium, Synthroid, Wellbutrin, Lexapro, Abilify, Fibercon, Trazadone, Magnesium Citrate, and Robitussin. (T. 394)

Plaintiff was admitted to Lakeland Regional Hospital on November 20, 2009 due to her suicidal ideations. (T. 624) Plaintiff had received text messages from other girls at school telling her to kill herself. She indicated to her mother she would rather kill herself than go back to school. (T. 627) A psychiatric evaluation conducted by Dr. Richard Aiken on November 20, 2011 showed Plaintiff was not in distress and was positive. She did not want to hurt herself and there were no psychotic features. Her mood was happy and appeared euthymic. She was oriented to person, place and time. Plaintiff's memory, concentration, and cognition were grossly within normal limits. (T. 634) Dr. Aiken assessed Plaintiff with major depressive disorder, mild, moderate, apparently in partial remission, and a GAF score of 19. (T. 634) Upon discharge on November 28, 2009, Dr. Mendez diagnosed her with mood disorder, not otherwise specified, rule out bipolar disorder, oppositional defiant disorder, substance abuse, and a GAF score of 30. (T. 624-625)

Plaintiff was discharged with the following medications: Trazodone, Synthroid, Lexapro, Prilosec, Abilify, and Wellbutrin. (T. 624)

Plaintiff was admitted to Lakeland Regional Hospital from January 26, 2010 until August 08, 2010 due to her mood disorder and oppositional defiant disorder. (T. 508) Treatment records from Lakeland showed after Plaintiff's discharge from Horizon she tried to get other people to kill her and offered to do anything for them to kill her. (T. 513) Plaintiff had a labile mood with rapid mood swings. She was depressed, angry, irritable, sad, sarcastic, guarded, and defensive. Her mood changed from happy to tearful to angry quickly. (T. 513) Plaintiff was very oppositional, defiant, manipulative, and impulsive. She would not follow the rules. She blamed others for her choices, had very poor insight, judgment, and coping skills. (T. 513) Plaintiff cut herself "to know I am alive, to watch the blood, and feel." (T. 513) She pulled out a fist full of hair in October 2009. Plaintiff was described as loud, demanding, attention seeking, and sarcastic. (T. 513) Treatment notes indicated she was unable to maintain appropriate behavior for any length of time. (T. 513) Prior psychiatric hospitalizations and residential treatment facilities included: three acute stays at Vista Health in December 2009 and prior to 2008; Horizon from September 10, 2009 to October 9, 2009; Lord's Ranch in 2008; Pinnacle Pointe in 2008; and, WAYS shelter on December 22, 2009 and several other stays. (T. 514)

Upon admission to Lakeland Regional Hospital on January 26, 2010, Plaintiff had a GAF score of 25. Plaintiff began hitting the timeout room wall with her fists and knuckles until they were swelling. Plaintiff then threw her body against the timeout room wall, hitting her shoulder repeatedly. Plaintiff was put under 24 hour watch after she began hitting her head against the wall and door. (T. 508-509)

On January 26, 2010, Dr. Maria Mendez conducted a psychiatric evaluation of the Plaintiff. Dr. Mendez observed Plaintiff was oriented to time, place, person, and situation. She did not have any insight, insisting she did not need to be in the hospital. During the evaluation Plaintiff smiled a lot and made good eye contact. Plaintiff denied hallucinations and suicidal thoughts or plans. Her memory was intact for immediate and recent recall. (T. 518) She had a fair ability to think in abstract concepts and her intelligence was average. (T. 518) Plaintiff denied being depressed, feeling worthless and irritable, or having problems with her appetite or sleep. Dr. Mendez noted Plaintiff had the following assets: verbal, good social skills, physically healthy, and she likes to draw and listen to music. (T. 519)

Dr. Mendez diagnosed Plaintiff with mood disorder not otherwise specified, bipolar disorder, oppositional defiant disorder, substance abuse multiple (had been clean for seven months), disorder of impulse control, and a GAF score of 25. (T. 519) Plaintiff's treatment plan included continuing her Wellbutrin, Lexapro, Synthroid, Prilosec, Allegra, and Trazadone. Plaintiff was started on Lamictal for her mood stabilization. The goal was to decrease her antidepressants as she seemed not to have any insight whatsoever. (T. 519) Plaintiff was prescribed Abilify to help her with aggression and impulsivity. (T. 519)

On February 28, 2010, Plaintiff was administered Thorazine after she attacked a staff member requiring seclusion and physical restraint. (T. 509) Plaintiff was transferred to another unit after stating she was suicidal and making superficial suicidal gestures. (T. 509) Nurse's notes indicated Plaintiff punched a nurse in the face and grabbed a large amount of her hair and pulled it out by the roots. She continued to hang onto and pull out the nurse's hair despite several staff members attempts to disentangle them. Plaintiff kicked another nurse in the face and hit her causing injury to the nurse. Plaintiff stated they got what they deserved and showed no remorse. (T. 613) Plaintiff

wrote about killing people and watching them die in her journal. She stated she loved the sight and taste of blood and the feeling of skin being cut. (T. 613)

On May 23, 2010 Plaintiff attempted to kill herself by putting a cord around her neck. (T. 695) Staff found her on the floor with her eyes rolled back and fluttering. She was not breathing well. They located a piece of stereo wire around her neck. Plaintiff kept saying go away, you should not have found me. (T. 699) Dr. Floyd D. Simpson performed a psychiatric evaluation of the Plaintiff where she denied prior sexual abuse, however there were numerous reports of prior sexual abuse. Plaintiff cried easily, denied feelings of helplessness, hopelessness, or worthlessness. She denied any thoughts of suicidal ideation or thoughts of self-harm. She stated she was not suicidal and indicated her attempted suicide was a mistake. Plaintiff was diagnosed with major depression, bipolar mood disorder, and antisocial personality disorder, and assessed a GAF of 35. (T. 704) Dr. Simpson indicated Plaintiff wanted to be taken off of Geodon because one of her goals was to reduce her medication prior to discharge. (T. 704)

On June 2, 2010 Plaintiff was discharged from another unit after an attempted suicide. She was diagnosed with major depression, bipolar mood disorder, anti-social personality disorder, and assessed a GAF score of 45. (T. 698) Plaintiff was discharged on August 19, 2010 with the following medications: Risperdal, Lamictal, Colace, Synthroid, Trazodone, Prilosec, Miralax, Thorazine, Tylenol, and ibuprofen. (T. 590) Treatment notes indicated Plaintiff made some progress during the latter part of her stay; however, she was not able to successfully complete the program due to her unstable behavior and length of time she spent not working on her treatment. (T. 509) Plaintiff was discharged on August 18, 2010 with a GAF score of 48 and was to follow up with Dr. Frisbie for medication management on August 25, 2010 and begin outpatient therapy

at Vista Health on September 7, 2010. (T. 510) At the time of discharge, Plaintiff was not considered to be a danger to herself or to others. (T. 510)

On December 8, 2010 Plaintiff sought treatment from APN Pham-Russell due to coughing up pus and blood. (T. 388) Plaintiff had the following major problems: gynecological examination, major depressive disorder, abdominal pain, bipolar disorder unspecified, and hypothyroidism unspecified acquired. (T. 389)

Plaintiff sought treatment for her annual exam from Dr. Frisbie on December 23, 2010. Plaintiff complained of hard stools, vomiting, cough, and congestion. (T. 384) The notes indicated Plaintiff had chronic constipation, depression, behavioral issues with multiple visits to Vista, and drug addiction. (T. 384) Plaintiff had extensive vaginal condyloma. (T. 387)

Plaintiff was seen by Dr. Frisbie on March 1, 2011 a follow up on her medical issues. She believed her infection was returning after her stay at Lord's Ranch and she had constant migraines. The notes indicated Plaintiff was anxious, her skin had red nodules on her thighs and perirectal areas, obese, and warts in vaginal area. (T. 382) Plaintiff was diagnosed with anxiety, hypothyroidism, HPV, vaginal warts, and migraines. (T. 382) Plaintiff was prescribed Topamax and Bactrim. (T. 383)

On September 8, 2011 Plaintiff went into preterm labor at Mercy Hospital. Plaintiff's baby died on September 11, 2011 and she was discharged on September 13, 2011. (T. 281-293)

On April 16, 2012, Plaintiff was seen at Western Arkansas Counseling and Guidance for a diagnostic evaluation by licensed counselor Joanie Henry. Plaintiff indicated she sought treatment because she applied for disability and needed continued services. (T. 332) Plaintiff reported she had a significant history of inpatient and outpatient services. (T. 332) She had recently moved to Ft. Smith and needed medication management. (T. 332)

Counselor Henry's notes indicated Plaintiff was adopted by Sharlot and Mark Wakefield when she was five months old. (T. 332-333) Plaintiff had trouble with her esophagus due to her bulimia and she had hypothyroidism. (T. 333) Plaintiff was alert and cooperative. Her motor behavior and speech quality and quantity were normal. (T. 333) Her mood was calm and affect restricted. Plaintiff's thought process was logical and coherent. (T. 333) Plaintiff's attention and concentration were normal. Her estimated range of intellectual ability was average; however, her insight and judgment were poor. (T. 333) Plaintiff struggled with her bulimia and her daily death wishes. She had not had inpatient treatment since 2010. (T. 334) Plaintiff had serious limitations with the following: grooming, household stability, communication, safety and environment, managing time, managing money, and nutrition. (T. 334) Very serious limitations were documented with the following: physical and mental health limitation, alcohol and drug use, community resource limitation, sexual behavior, and work productivity. (T. 334) Plaintiff was diagnosed with mood disorder, not otherwise specified, bulimia nervosa, conduct disorder, unspecified onset, borderline personality disorder, problems with primary support group, problems related to social environment, and assessed a GAF score of 45. (T. 335) Plaintiff agreed to receive outpatient services; however, she did not have the means to afford the treatment. (T. 335)

Plaintiff was seen at Mercy Hospital Fort Smith on April 25, 2012 due to a rash, vomiting, and memory loss. (T. 294) The doctor noted Plaintiff's Seroquel could have caused her memory loss. (T. 297) During the examination the doctor noted Plaintiff was negative for suicidal ideas, hallucinations, confusion, self-injury, dysphoric mood and agitation. (T. 298) Upon examination, Plaintiff was oriented to person, place, and time; her mood, affect, and judgment were normal. (T. 300) Plaintiff was diagnosed with scabies, folliculitis, and esophagitis. (T. 295) Plaintiff was prescribed Cephalexin, Pantoprazole, Permethrin, and Sucralfate and she was to continue to take

the following medications: Hydrocodone-Acetaminophen, Levsin, Synthroid, Sucralfate, Zolpidem, and a prenatal vitamin. (T. 296-297)

On July 5, 2012, Plaintiff was admitted to Mercy Hospital Fort Smith due to an attempted suicide. (T. 304) Plaintiff reported she took a rope and wrapped it around her neck, tied it to a door, and sat on the floor. The notes indicated Plaintiff had a red mark around her neck. (T. 309) Plaintiff had prior self-abusive behavior with volar forearm and wrist lacerations and scars. (T. 311) Plaintiff reported life was not worth living. (T. 311) The notes indicated Plaintiff's degree of incapacity she experienced as a consequence of her illness was severe. (T. 311) Symptoms of the Plaintiff's illness included: harm interpersonal relations, anhedonia, agitation, and psychomotor retardation of feelings of worthlessness. Plaintiff indicated she had a plan to commit suicide, she had suicidal ideations, and contemplated harming herself. (T. 311) Dr. Kevin Griffith diagnosed Plaintiff with suicide attempt and borderline personality disorder. (T. 304, 308) The notes indicated Plaintiff would not voluntarily be committed to the State Hospital, thus "James" at Western Arkansas Counseling and Guidance recommended she be brought before a court for a commitment to the State hospital the next morning. (T. 320) Even though Plaintiff had an evaluation for inpatient treatment with Vista and "James" recommended a commitment to the State Hospital, she was discharged to the care of her family to follow up closely with Western Arkansas Counseling and Guidance. (T. 318, 305) Plaintiff was prescribed Benzatropine, Haldol and Ativan and was discharged on July 6, 2012. (T. 305, 309)

Despite "James'" recommendation, Plaintiff was discharged from Western Arkansas Counseling and Guidance on July 6, 2012. Plaintiff was not compliant with attending sessions and she no longer lived at the address provided. Plaintiff struggled to address her issues. She was unhappy and did not know how to be anything but unhappy. (T. 345)

On November 15, 2012 Plaintiff was seen by Dr. Suh Niba. Plaintiff was pregnant, needed her thyroid checked, and was concerned about nose bleeds. (T. 360) Plaintiff was referred to Dr. Laws and prescribed Regan and Cephalexin. (T. 361)

The opinion medical evidence is as follows.

On October 4, 2012 Dr. Terry L. Efird, psychologist and state agency medical consultant, performed a mental diagnostic examination of the Plaintiff. (T. 351) Plaintiff reported to filing for disability benefits secondary to "I can't be around people." (T. 351) While Plaintiff was able to drive, she was not comfortable driving unfamiliar routes. She denied shopping, handling finances, and performing household chores. Plaintiff got on Facebook and texted daily. Dr. Efird observed Plaintiff communicated and interacted in a reasonably socially adequate manner. However, her piercings, tattoos, and ear gauging might cause difficulty interacting with people. (T. 354) Dr. Efird opined Plaintiff had the capacity to perform basic cognitive tasks required for basic work like activities. Plaintiff appeared to be able to track and respond adequately during the evaluation. (T. 354) Dr. Efird did not observe any remarkable problems with persistence and it appeared Plaintiff had the mental capacity to persist with tasks, if desired. (T. 355) It appeared the Plaintiff was capable of performing basic work like tasks within a reasonable timeframe and she was able to manage funds without assistance. (T. 355) Dr. Efird diagnosed Plaintiff with post-traumatic stress disorder, major depressive disorder, moderate; polysubstance abuse, in remission, borderline personality disorder, and a GAF score of 40-50. (T. 354)

On October 8, 2012, psychologist and state agency medical consultant, Dr. Kevin Santulli, reviewed the medical evidence from Dr. Efird, Western Arkansas Counseling and Guidance, Plaintiff's Function Report, pain form, work history report, third party function report, and an emergency room visit at St. Edwards Mercy Medical Center. (T. 64) Dr. Santulli determined

Plaintiff was moderately limited in maintaining social functioning and concentration, persistence, or pace and mildly limited in her activities of daily living. (T. 66) Dr. Santulli opined the Plaintiff retained the ability to perform unskilled work. (T. 70) Plaintiff was not significantly limited in the following abilities: carrying out very short and simple instructions; carrying out detailed instructions; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; sustaining an ordinary routine without special supervision; working in coordination with or in proximity to others without being districted by them; making simple work-related decisions; asking simple questions or request assistance; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; being aware of normal hazards and taking appropriate precautions; and, traveling in unfamiliar places or using public transportation. (T. 68-69) On December 30, 2012, psychologist and state agency medical consultant, Melissa F. Jackson, reviewed the record, noted Plaintiff did not provide any new medical evidence on reconsideration, and affirmed Dr. Santulli's findings. (T. 74-84)

Plaintiff argues the ALJ erred when he relied on Dr. Efird's mental diagnostic examination in determining Plaintiff's RFC.  The Court agrees.

The evaluation of a mental impairment is often more complicated than the evaluation of a claimed physical impairment.  *Andler v. Chater,* 100 F.3d 1389, 1393 (8th Cir. 1996).  Evidence of symptom-free periods, which may negate the finding of a physical disability, do not compel a finding that disability based on a mental disorder has ceased.  *Id*.  Mental illness can be extremely difficult to predict, and remissions are often of "uncertain duration and marked by the impending possibility of relapse."  *Id.*  Individuals suffering from mental disorders often have their lives structured to minimize stress and help control their symptoms, indicating that they may actually be more impaired than their symptoms indicate.  *Hutsell v. Massanari,* 259 F.3d 707, 711 (8th Cir.

16

2001); 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(E) (1999).  This limited tolerance for stress is particularly relevant because a claimant's residual functional capacity is based on their "ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  *McCoy v. Schweiker,* 683 F.2d at 1147 (abrogated on other grounds).

When Dr. Efird conducted his mental diagnostic examination of the Plaintiff the only records he had were that of St. Edwards Mercy Hospital Fort Smith, a letter from Vista stating no medical records were available for the dates requested, and the records from Western Arkansas Counseling and Guidance.  Dr. Efird did not have the benefit of reviewing all of the Plaintiff's past medical inpatient and outpatient treatment records.  Those treatment records laid a predicate for the depth of Plaintiff's mental illnesses.

The ALJ gave the opinions by Drs. Efird, Santulli, and Jackson substantial weight, as they were consistent with each other and with the medical evidence as a whole.  None of these doctors had the benefit of reviewing Plaintiff's inpatient treatment records or those of Dr. Frisbie.  Plaintiff continued to have suicidal ideations. (T. 311) The ALJ noted that Plaintiff declined inpatient treatment; however, the counselor at Western Arkansas Counseling and Guidance and Dr. Griffin recommended she be evaluated by the court for involuntary commitment to the Arkansas State Hospital.  According to the *Diagnostic and Statistical Manual of Mental Disorders DSM-IV* ("*DSM-IV*"), patients suffering from schizophrenia, schizoaffective disorder, and bipolar disorder also suffer from anosognosia, or poor insight.  *DSM IV-TR* 304, 321, 359 (4th ed. 2000).  "Evidence suggests that poor insight is a manifestation of the illness, rather than a coping strategy. . . .  This symptom predisposes the individual to noncompliance with treatment and has been found to be

predictive of higher relapse rates, increased number of involuntary hospital admissions, poorer psychosocial functioning, and a poorer course of illness." *Id*.

Because the ALJ relied upon the opinions of Drs. Efird, Santulli, and Jackson, which were based upon an examination and reviews without the benefit of all of the Plaintiff's mental health and medical records, the Court cannot find that substantial evidence supports the ALJ's RFC determination. In reviewing the record, it appears the Plaintiff did have treatment records at Vista Health - just not for the date requested. (T. 329) On remand, the ALJ is ordered to obtain all of Plaintiff's medical records from Vista Health, and to provide all of the medical records to Dr. Efird for him to perform another mental RFC evaluation of the Plaintiff. Furthermore, the ALJ is directed to obtain a mental RFC from Plaintiff's treating physicians and question them regarding the effects the medications have on the Plaintiff's condition and how Plaintiff mental illness would affect her daily activities at work. The doctors need to determine whether Plaintiff can perform the requisite physical and mental demands of working eight hours a day five days a week and what limitations and restrictions are recommended for her.

Plaintiff also argues the ALJ failed to properly consider Plaintiff's GAF scores. (Doc. 10, pp. 12-14) The GAF is a numerical assessment between zero and 100 that reflects a mental health examiner's judgment of the individual's social, occupational, and psychological function. *Kluesner v. Astrue*, 607 F.3d 533, 535 (8th Cir. 2010). The ALJ acknowledged Plaintiff's GAF scores purported to measure her functional abilities, however, he gave it little weight as it revealed only a "picture in time and [was] very subjective with the examiner." (T. 19) A review of the record shows that Plaintiff had over thirty GAF scores ranging from 15 to 48. (T. 335, 370, 431, 463, 508, 519, 544-547, 550-552, 554, 557-571, 624-625, 634, 646, 698) Plaintiff never had a GAF score over 50, and most of her scores were in the 30s, which indicated her "behavior [wa]s

considerably influenced by delusions or hallucinations or serious impairment in communication or judgement… or in ability to function in almost all areas." *DSM-IV-TR* at 34. The history of GAF scores at 50 or below indicated Plaintiff had "serious symptoms…or any serious impairment in social, occupational, or school functioning. *Id.; See Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003) ("This GAF score reflects serious limitations in the patient's general ability to perform basic tasks of daily life, and the record shows that the VE considered a claimant with a GAF of 50 unable to find any work.") In the Court's opinion, the ALJ did not give good reasons for discounting the consistently low GAF ratings assessed by Plaintiff's mental health providers. Even Dr. Efird assessed a GAF score of 40-50 during his mental examination. (T. 351) Upon remand, the ALJ should give consideration to Plaintiff's GAF scores and how they correlate to Plaintiff's mental limitations.

It is the ALJ's duty to determine the Plaintiff's RFC. Before doing so, the ALJ must determine the applicant's credibility, and how the Plaintiff's subjective complaints play a role in assessing his RFC. *Pearsall v. Massanari,* 274 F.3d at 1217-18. After reviewing the record as a whole, the Court also finds deficiencies in the ALJ's credibility analysis and application of the *Polaski* factors. The ALJ discredited Plaintiff on her failure to comply with treatment. Plaintiff was diagnosed with major depression, bipolar mood disorder, and antisocial personality disorder, and she lacked insight and good judgment. (T. 333) Further, after Plaintiff's most recent suicide attempt, Plaintiff was accepted into the inpatient mental health care program at Bridgeway Hospital in Little Rock, Arkansas. (T. 323) Despite the doctor's recommendation that Plaintiff attend impatient treatment, Plaintiff was discharged into the care of her family to follow up closely with Western Arkansas Counseling and Guidance, who then inexplicably discharged her from treatment the following day. (T. 318) Plaintiff's mother also reported to the doctor that she was unable to afford medications.

19

(T. 319) This further supports the Court's concern about Plaintiff having poor insight and judgment and not taking her medications.

The ALJ also discounted Plaintiff's credibility, in part, because he found that she took care of her newborn baby at night. The record fails to substantiate the ALJ's conclusion. While Plaintiff testified she took care of her baby at night (T. 37), the evidence showed that the baby actually slept in the bedroom of Plaintiff's mother, Sharlot Wakefield, and the Plaintiff would only come check on the baby nightly to see if she was breathing. (T. 47) There was no indication from Sharlot Wakefield of the Plaintiff taking the baby out of the room at night to provide care. Furthermore, the Court cannot determine from the record whether the ALJ overlooked, gave some weight, or completely disregarded the testimony and the third party function report of Sharlot Wakefield. Upon remand, the ALJ should conduct a proper *Polaski* analysis and include an analysis of Sharlot Wakefield's testimony and third party function report.

### IV.    Conclusion:

Based on the foregoing, I must reverse the decision of the ALJ and remand this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. §405(g).

Dated this 21st day of July, 2015.

/s/ Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE